UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Edinboro College Park, Apartments et al.**, | ) ) ) |
| *Plaintiffs*, | ) )   C.A. No.   15-121 Erie |
| v. | ) ) |
| **Edinboro University Foundation and Julie Wollman,** | ) ) ) |
| *Defendants*. | ) ) |

Plaintiffs Edinboro College Park Apartments—along with several other owners of apartment buildings located near Edinboro University—bring the present action against Defendant Edinboro University Foundation (the "Foundation") and Defendant Julie Wollman, the President of Edinboro University. Plaintiffs allege that Defendants "monopolized trade or commerce with respect to student housing at Edinboro University," and, in doing so, violated the Sherman Antitrust Act, 18 U.S.C. Sections 1-7, (hereinafter, the "Sherman Act") and tortiously interfered with their business. Doc. No. 31 at 1. Defendants have moved to dismiss Plaintiffs' Complaint.

After reviewing the briefs and all other relevant material properly before the Court, the Court grants the motion to dismiss. The Court's reasoning follows:

I. BACKGROUND

Edinboro University[1] (the "University") is a public university located in Edinboro Pennsylvania. (Doc. No. 31 at para. 7). The University is a constituent member of the Pennsylvania System of Higher Education ("PASSHE"). (*Id*.). Defendant Julie Willman is the

---

[1] The University is not named as a Defendant in this action.

1

President of the University. (*Id*. at para. 6). In 2006, the University decided to construct eight new on-campus student-housing facilities, collectively referred to as "the Highlands." (*Id*. at paras. 16-17). At some point, the University determined that it was more efficient to have a private company build and maintain the Highlands. (Doc. No. 31 at paras. 16 and 19). It did not solicit bids from private businesses for the construction of the Highlands; rather, the University reached out directly to the Foundation[2] and asked it to construct and operate the Highlands. (*Id.* at 17).

In 2008, the University and the Foundation entered into an agreement regarding the financing, construction, and operation of the Highlands. (Doc. No. 31 at 17). The Pennsylvania Higher Educational Facilities Authority—a governmental authority—agreed to provide the Foundation with two tax-exempt bond issues; the Foundation, in turn, agreed to use these funds to lease on-campus property and pay for the construction and administration of the Highlands. (*Id.* at paras. 16 and 17). The agreement also contemplated that the Foundation would use the revenue from the Highlands to repay these bonds. (Doc. No. 31 at paras. 18, 20, 25-30).

In May 2011, the University altered its on-campus residence policy. (Doc. No. 31 at para. 42). The former policy required the majority of first-year and transfer students to reside in university-owned housing for two consecutive semesters. (Doc. No. 31 at paras. 43-44). Under the new policy, students were required to live in "university-owned or affiliate housing" for four consecutive semesters or until they have completed 59 credit hours. (Doc. No. 31 at para. 45). The Highlands is part of this "affiliate housing;" Plaintiffs' buildings are not.

On May 5, 2015, Plaintiffs filed a complaint against Defendants, alleging that the arrangement between the University and the Foundation was anticompetitive and, therefore,

---

[2] The Foundation is a non-profit entity founded in August 1998 that exists to benefit the students of Edinboro University. (Doc. No. 31 at para. 15).

2

violated the Sherman Antitrust Act. (Doc. No. 41). According to Plaintiffs, the University gave the Foundation an unfair advantage by altering its residency policy, allowing the Foundation to build on-campus, and providing it with tax-free bonds. Plaintiffs also allege that these actions constitute tortious interference with contract.[3] (Doc. No. 41 at 23). Defendants have moved for dismissal. (Doc. No. 36 and 47). Defendants argue that all of the alleged injuries stem from state action and, therefore, cannot support a claim for recovery under the Sherman Act.

II.  CLAIMS UNDER THE SHERMAN ACT

The Sherman Act prohibits every contract, combination, or conspiracy in restraint of interstate or foreign commerce, including monopolization or attempted monopolization by any person or combination of persons of any part of interstate or foreign commerce. 15 U.S.C. § 1, § 2.

Plaintiffs assert that Defendants violated the Sherman Act by entering into an anti-competitive partnership with the University to "unfairly compete against Plaintiffs . . . in the student housing market in the vicinity of the Edinboro University." Doc. No. 43, Plaintiff's Opposition Brief, at 5. According to Plaintiffs, this partnership gave the Foundation an unfair advantage because the Foundation was able to construct student housing facility on-campus and the University "rigged the game" by "imposing student housing restrictions to ensure market share and financial success." *Id.* Defendants move to dismiss these claims on the grounds that they are immune from federal antitrust liability under the state action doctrine articulated by the United States Supreme Court in *Parker v. Brown,* 317 U.S. 341 (1943).

**A.  *Parker* Doctrine**

---

[3] The Court has supplemental jurisdiction over this claim as it arises out of the Sherman Act claim.

3

It is clear that the purpose of the Sherman Act "was to suppress combinations to restrain competition and attempts to monopolize by [private] *individuals and corporations*." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Equally clear is that the Sherman Act was not intended to restrain "state action" or "official action directed by the state." *Id.* at 351; *A.D. Bedell Wholesale Co., Inc. v. Phillip Morris, Inc.,* 263 F.3d 239, 255 (3d Cir. 2001). Rather, Congress chose to respect the principle of comity and allowed the states to control their officers and agents in this context. *Parker*, 317 U.S. at 351. Therefore, a plaintiff may not bring an antitrust claim against a state, nor may it bring a claim against the state's officers or agents when their activities are directed by the state. *A.D. Bedell Wholesale Co., Inc. v. Phillip Morris, Inc.,* 263 F.3d 239, 255 (3d Cir. 2001) (citing *S. Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 54 (1985)).

In order to give effect to *Parker*, the Third Circuit has extended *Parker* immunity to the private parties involved in the state action. *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 256 (3d Cir. 2001) ("[o]therwise, plaintiffs could sue only the private parties and by winning antitrust judgments against them, could thwart state policies as if there were no state immunity"). *Id.* Accordingly, "if relief is sought solely for injuries as to which the state would enjoy immunity under *Parker*, the private [actor] also enjoys immunity." *Id.*; *See also Armstrong Surgical Ctr., Inc. v. Muni. of Monroeville*, 617 F. Supp. 820, 823 (W.D. Pa. 1985); *Alonzo v. Blue Cross of Greater Philadelphia*, 611 F. Supp. 310, 314,15 (E.D.Pa. 1984).

Therefore, the question before the Court is two-fold. First, did the University engage in "state action" as defined by the Parker immunity doctrine; second, does the relief sought against the Foundation relate solely to injuries as to which the University enjoys immunity?

   *1. The Injuries Resulted From State Action*

It is well-established that injuries resulting from "direct state action" are covered by the *Parker* immunity doctrine. *See City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379 (1991). An injury is considered the result of "direct state action" when it is the "direct result of acts within the traditional sovereign powers of the state." *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 256 (3d Cir. 2001). Therefore, there are two requirements for direct state action: the state agency must have engaged in the relevant action; and that action must concern a traditional area of state power. *Id*.

All claims in this case involve the University's actions. The Pennsylvania Constitution expressly provides that the Pennsylvania General Assembly must "provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. Art. III, Sect. 14. To that end, the General Assembly created Pennsylvania State System of Higher Education ("PASSHE"). Pa. C.S.A. Section 20-2002-A(a). The General Assembly charged "each [PASSHE] institution" with providing "appropriate educational facilities [and] student living facilities." 24 P.S. Section 20-2003-A(a). In order to help PASSHE institutions to achieve that goal, it gave each on the power to "acquire, purchase, hold, lease as lessee and use any property, real, personal or mixed, tangible or intangible, necessary or desirable for carrying out the purpose of the system." 24 P.S. Section 20-2003-A(b). The University is a PASSHE institution. Accordingly, there can be no dispute that the University is "an arm of the state by way of its affiliation with the PASSHE." *See, e.g. Bartlett v. Kutztown Univ.*, 2015 Dist. LEXIS 21665 (E.D. Pa. Feb. 23, 2015); *Wynne v. Shippensburg University* 639 F.Supp. 76, 82 (M.D. Pa. 1985). *See also Board of Governors of University of North Carolina v. Helpingstone*, 714 F. Supp. 167 (M.D. N.C. 1989) (public university immune from antitrust liability). In fact, Plaintiffs do not dispute that the University is a state entity. (Doc. No. 43 at 7).

Nor can there be any doubt that the provision of student housing concerns an area of traditional state power. It is well-established in the Third Circuit that the maintenance of a "thorough and efficient system" of public higher education is a traditional state function. *See Skehan v. State System of Higher Education*, 815 F.2d 244, 248 (3d Cir. 1987) ("Providing education has long been recognized as a function of state government."). Moreover, as discussed *supra*, the General Assembly created PASSHE to discharge its constitutional obligations and expressly charged each PASSHE institution with a specific task: provide "appropriate educational facilities [and] student living facilities." Pa. C.S.A. Section 20-2002-A(a); 24 P.S. Section 20-2003-A(a).[4]

In light of these clear constitutional and statutory obligations, there can be no doubt that the University's actions regarding the provision of on-campus housing to its students falls well within the scope of the *Parker* immunity doctrine.

*2. The Foundation Shares the University's Immunity*

Private parties are entitled to antitrust immunity for the role they play in a state action; therefore, "if the relief is sought solely for injuries as to which the state would enjoy immunity under *Parker*, the private [actor] also enjoys immunity." *See also Armstrong Surgical Ctr., Inc. v. Muni. of Monroeville*, 617 F.Supp. 820, 823 (W.D. Pa. 1985); *Alonzo v. Blue Cross of Greater Philadelphia*, 611 F. Supp. 310, 314-15 (E.D. Pa. 1984). If, however, the plaintiff identifies injuries that are separate and apart from the state's actions, then immunity does not apply. *Id*.

---

[4] Plaintiffs argue that the University was not fulfilling a state function because its actions were limited to its own campus. This argument is clearly meritless. Not only do Plaintiffs fail to provide any legal support for this argument, but also it is clear that *each* PASSHE member is considered a state entity. Therefore, the action of *each* university amounts to state action.

Defendants are entitled to the same immunity enjoyed by the University because every antitrust violation alleged in the Complaint arises directly from Defendants' partnership with the University. In fact, the core allegations in this case—such as failing to seek bids, offering the Foundation an on-campus lease, providing the Foundation with financing through their tax-exempt bond issues, and altering the on-campus resident policy—concern actions undertaken by the University itself. Accordingly, Defendants are entitled to *Parker* immunity.[5]

### 3. *Market Participant Exception*

Plaintiffs further argue that neither the University nor Defendants are entitled to *Parker* immunity because the University was not acting in its sovereign capacity. Rather, according to Plaintiffs, the University was acting as a competitor in the student housing market and, therefore, is barred from immunity under the "market participant" exception. Defendants counter that there is no "market participant" exception to *Parker* immunity and, in any event, such an exception would not apply on the facts of the case.

Neither the Supreme Court nor the Third Circuit have recognized a "market participant" exception to *Parker* immunity.[6] In fact, every Circuit to address the issue has rejected this theory. *See Automated Salvage*, 155 F.3d at 80 ("market participant exception" did not apply); *Limeco, Inc. v. Div. of Lime of Mississippi Dep't of Ag. &Comm.*, 778 F.2d 1086, 1086-87 (5th Cir. 1985) (Congress did not intend for Sherman Act to restrict state actions); *See also FTC v. Phoebe Putney Health Sys., Inc.* 133 S.Ct. 1003, 1010 n. 4 (2013) (declining amicus curiae's request to "recognize

---

[5] Plaintiffs' briefing is very unclear on this point. Plaintiffs assert that the relief sought does not relate solely to the University's state action and then mention *A.D. Bedell* in passing. However, *A.D. Bedell* is completely inapposite. *A.D. Bedell* involved allegations that private actors abused a regulatory system in order to create a cartel. The Third Circuit found that the private actors were not involved in any direct state action on the grounds that the state only set up the regulatory regime and did not monitor or control any actions once that regime was in place. *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 258 (3d Cir. 2001).

[6] Plaintiffs claim that several courts have adopted this exception. However, each of Plaintiffs' citations concern mere *dicta*.

7

and apply a 'market participant' exception to the state-action immunity" suggests that such an exception is not available).

However, the Court need not decide whether the market participant exception is available as a matter of law to resolve this case. Even assuming that the market participant exception applied in the Third Circuit, it clearly would not apply to the case at hand. Nothing in the Complaint suggests that the University was acting outside its sovereign capacity. Rather, as set forth *supra*, each of the alleged injuries stem directly from the University's attempts to discharge its constitutional and statutory obligations to provide proper education and housing. *See, e.g.* 24 P.S. Section 20-2003-A(a). Such acts are clearly traditional state functions and, therefore, the market participant exception clearly does not apply.

### III.   TORTIOUS INTERFERENCE CLAIM

The Court had jurisdiction over the tortious interference claim pursuant to 28 U.S.C. Section 1367 because the claim arose out of the same case or controversy as the Sherman Act claims. While Section 1367 states that a district court may exercise supplemental jurisdiction over non-federal claims arising from the same case or controversy as a federal claim, the decision as to whether to exercise such jurisdiction is discretionary. *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 308 (3d Cir. 2003), *as amended* (Nov. 14, 2003).

The Sherman Act claim—the only federal claim in this case—has been dismissed. Accordingly, the Court finds that the exercise of jurisdiction over the state law claim will not promote judicial economy or efficiency; rather, this claim is better suited for state court. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (supplemental jurisdiction exists to

promote judicial economy). Therefore, the Court will exercise its discretion to decline jurisdiction over the state law claim.[7]

IV. CONCLUSION AND ORDER

For the reasons set forth above, it is HEREBY ORDERED that:

1. Defendants' Motion to Dismiss is GRANTED; and

2. Plaintiffs' Complaint is DISMISSED.

*[signature]*

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

---

[7] The Court finds it unnecessary to reach the parties' *Noerr-Pennington* arguments.

9